IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AGUEDA ESPINOZA,<br><br>    Plaintiff,<br><br>  v.<br><br>OFFICER SEAN ULITIN, et al.,<br><br>    Defendants. | No. C-07-04678 EDL<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

On September 11, 2007, Plaintiff Agueda Espinoza, who was proceeding pro se, filed this lawsuit against Officers Ulitin and Davis of the Napa Police Department alleging violations of 42 U.S.C. § 1983 and various state laws. Subsequently, Plaintiff retained counsel and on April 3, 2008, Plaintiff's counsel filed an amended complaint, alleging one claim for violation of § 1983. Defendants seek summary judgment of the § 1983 claim, arguing that no constitutional violation occurred, and that even if a violation occurred, the officers are entitled to qualified immunity. Plaintiff opposed the summary judgment motion as to Officer Ulitin, but conceded that Officer Davis should be dismissed from the lawsuit and that the brief detention of Plaintiff was legally justified. Therefore, Defendants' Motion for Summary Judgment is granted as to Officer Davis. The only remaining claim is one for excessive force against Officer Ulitin.

**Facts**

On September 30, 2005, Plaintiff's two children were taken into the custody of Child Protective Services ("CPS") in Napa. See Defs.' Ex. A; Boscovich Decl. Ex. A at 66:2-24. The children were taken into custody because they had given information to the police about the allegedly violent and abusive nature of their father, Plaintiff's husband. See Ulitin Decl. ¶ 2. Plaintiff and her husband went to CPS to see the children, but could not get any information. See

1  Boscovich Decl. Ex. A at 66:24-67:9.  While she was in the parking lot after going to the CPS

2  office, Plaintiff received a cell phone call from Officer Ulitin who said that her children were at the

3  CPS office.  See Boscovich Decl. Ex. A at 69:4-7.  At the CPS office, Plaintiff saw Officer Ulitin.

4  See id. at 67:23-68:5; 70:7-9.  Plaintiff and Officer Ulitin had a conversation about her husband, and

5  what was happening with the children.  See id. at 70:12-71:1; Ulitin Decl. ¶ 5.  She told Officer

6  Ulitin that if he was interviewing her, she wanted an attorney.  See id. at 71:13-16.  Plaintiff does not

7  believe that Officer Ulitin was responsible for her not being able to see her children.  See id. at 75:9-

8  13.

9        Outside of the CPS building, Officer Ulitin arrested Plaintiff's husband because Officer

10 Ulitin learned that he had two outstanding warrants for domestic violence.  See Ulitin Decl. ¶ 7;

11 Boscovich Decl. Ex. A at 75:25-76:13.  Police Officer Davis and Community Services Officer

12 Roman Montanez were within a few feet of Officer Ulitin at the time.  See Ulitin Decl. ¶ 7;

13 Boscovich Decl. Ex. A at 72:13-22.  When Plaintiff's husband was arrested, Plaintiff said to him in

14 Spanish: "if they take my children away, they kill me."  Boscovich Decl. Ex. A at 78:7-8.  Officer

15 Montanez heard Plaintiff speak, and interpreted Plaintiff's statement as a threat to kill herself.  See

16 Montanez Decl. ¶ 5 ("I remember her say the phrase "me voy a matar," which literally means "I am

17 going to kill myself.").  Officer Montanez told Officer Ulitin that Plaintiff said something about

18 killing herself.  See Montanez Decl. ¶ 6.  Plaintiff testified that she did not use the verb "matar."

19 Boscovich Decl. Ex. A at 79:2-6.  Plaintiff was very emotional at this time.  See Davis Decl. ¶ 3.

20       Plaintiff walked away from the officers and her husband.  See Boscovich Decl. Ex. A at

21 83:9-87:3.  She reached her car, which was parked with the front of the car facing some bushes.  See

22 Boscovich Decl. Ex. A at 87:6-8.  When she reached the car, she got in, sat down, and turned it on.

23 See id. at 87:14-15.  She was going to get medication for her daughter, who has a serious illness.

24 See id. at 87:15.  Officer Ulitin then arrived at Plaintiff's car.  See id. at 87:16; Ulitin Decl. ¶ 10.  He

25 did not hear that she was going to get medication.  See Ulitin Decl. ¶ 18.  The driver's side window

26 was rolled up.  See Boscovich Decl. Ex. A at 87:20-21.  Plaintiff heard a noise like the car being hit

27 and Officer Ulitin opened the door.  See id. at 87:23-24.  She did not hear Officer Ulitin say

28 anything prior to the door opening.  See id. at 87:25-88:2.  Officer Ulitin stood in the crook of the

**United States District Court**
For the Northern District of California

2

1  open driver's side door as he began to speak to her.  See Ulitin Decl. ¶ 10.  He was concerned about
2  her safety in light of what he thought was a suicidal statement and he thought he had an obligation to
3  assess her demeanor.  See Ulitin Decl. ¶¶ 9, 17.  Officer Davis was also concerned about Plaintiff's
4  well-being given that her children had been taken by CPS and her husband had been arrested.  See
5  Davis Decl. ¶ 5.

6        Officer Ulitin knew he was in a dangerous position if Plaintiff decided to put the car in
7  reverse and leave her parking space.  See Ulitin Decl. ¶ 11; Davis Decl. ¶ 8.  Officer Davis was
8  initially on the passenger side of the car, but he moved to the driver's side shortly thereafter.  See
9  Davis Decl. ¶ 7.  In an effort to determine whether Plaintiff was a danger to herself, Officer Ulitin
10 asked her questions about her mental state and her intentions.  See Ulitin Decl. ¶ 12; Boscovich
11 Decl. Ex. A at 89:1-24.  She stated that she was not going to kill herself, but that "it was up to
12 [CPS]" as to whether she was going to be okay, referencing what was happening to her children.
13 See Boscovich Decl. Ex. A at 89:8-24.  Plaintiff thought Officer Ulitin's tone of speech was strong
14 and not soft.  See Boscovich Decl. Ex. A at 96:10.

15       Plaintiff then turned the engine off and removed the keys from the ignition and held them
16 in one hand near her body.  See Ulitin Decl. ¶ 13; Boscovich Decl. Ex. A at 90:1-18.  At that point,
17 Officer Ulitin grabbed the keys from Plaintiff's hand.  See Ulitin Decl. ¶ 13 ("I grabbed the keys
18 from her with my right hand."); Boscovich Decl. Ex. A at 90:13-15 ("That's when he grabbed them
19 out of my hand, forcefully."); 20-21 ("That's when he grabbed them away from me fast, in a few
20 seconds."); Davis Decl. ¶ 9 ("Within a minute or two, I saw Officer Ulitin suddenly reach for and
21 grasp the keys from Plaintiff's hand as she sat in the driver seat.  She did not let go, and the key ring
22 broke apart with some of the keys falling loose.").  Plaintiff did not let go of the keychain.  See
23 Ulitin Decl. ¶ 13.  The keychain broke, leaving some keys in Officer Ulitin's hand, some in
24 Plaintiff's hand and some scattered in her lap.  See Ulitin Decl. ¶ 13 ("I ended up with part of the
25 keys and keychain; Plaintiff ended up with another part, and some fell on the ground.  I did not
26 touch Plaintiff - I simply grabbed the keys from her hand with my right  hand."); Boscovich Decl.
27 Ex. A at 90:21-24 ("That's when the key chain broke, some -- in different parts.  Some went onto the
28 floor, some came down here, and that's the other portion he kept in his hand.").  Officer Ulitin did

3

1  not touch Plaintiff when he grabbed the keys.  See Boscovich Decl. Ex. A at 92:23-93:5.  He did not
2  say anything after pulling the keys.  See Boscovich Decl. Ex. A at 97:25-98:2.  Officer Ulitin
3  returned the keys to either Plaintiff or Officer Davis, who was still at the scene.  See Ulitin Decl. ¶
4  14; Boscovich Decl. Ex. A at 99:6-16.  The entire episode lasted about three to five minutes.  See
5  Ulitin Decl. ¶ 16.  After that, Officer Davis took over the discussion with Plaintiff using a calm
6  voice.  See Boscovich Decl. Ex. A at 98:3-10; Davis Decl. ¶ 10.

7  Plaintiff felt "horrible pain" when the keys were pulled from her hand.  See Boscovich
8  Decl. Ex. A at 92:22.  She found out later that she had a sprained finger that required a splint.  See
9  Boscovich Decl. Ex. A at 94:12-95:6.

**Legal Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The nonmoving party's evidence must be believed and "all justifiable inferences must be drawn in [the nonmovant's] favor."  United Steelworkers of America v. Phelps Dodge Corp. , 865 F.2d 1539, 1542 (9th Cir. 1989) (en banc) (citing Liberty Lobby, 477 U.S. at 255).

The moving party bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatory answers, admissions and affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party will bear the burden of proof at trial, the moving party's burden is discharged when it shows the court that there is an absence of evidence to support the nonmoving party's case.  See id. at 325.  A party opposing a properly supported motion for summary judgment  "may not rest upon the mere allegations or denials of [that] party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); Liberty Lobby, 477 U.S. at 250.

**Discussion**

The only question before the Court is whether Officer Ulitin is entitled to qualified immunity thereby protecting him from liability for civil damages arising from Plaintiff's claim of excessive force. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1962) (Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). In Saucier v. Katz, 533 U.S. 194, 201 (2001), the Supreme Court mandated a two-step sequential process for resolving claims of qualified immunity. First, a court must consider the threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier, 533 U.S. at 201 ("In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established."). Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id. In Pearson v. Callahan, ___ S. Ct. ___, 2009 WL 128768 (U.S. January 21, 2009), the Court receded from Saucier, holding "that the Saucier protocol should not be regarded as mandatory in all cases," but instead judges should exercise their sound discretion as to which of the two prongs of the analysis to address first. Pearson, ___ S. Ct. ___, 2009 WL 128768, at *9. In Pearson, the Court determined that the officers in that case were entitled to qualified immunity "on the ground that it was not clearly established at the time of the search that their conduct was unconstitutional" without first deciding whether the facts shown by the plaintiff constituted a violation of a constitutional right. Id. at *3.

The standard for qualified immunity is the "'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 638 (1987) (citing Harlow v. Fitzgerald, 457 U.S. 800 (1982)). "Therefore, regardless of whether the constitutional violation occurred, the [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably believed that his particular conduct was lawful." Romero v. Kitsap County, 931 F. 2d

624, 627 (9th Cir. 1991). If Defendants had a reasonable but mistaken belief that their conduct was lawful, qualified immunity applies. Saucier, 533 U.S. at 205-6.

Here, as permitted by Pearson, the Court need not address the first prong of the Saucier analysis. Even if Plaintiff has shown a violation of her constitutional rights, Plaintiff has not met her burden of showing that it was clearly established at the time of the incident at issue in this case that Officer Ulitin's conduct was unconstitutional. See Kennedy v. Ridgefield City, 439 F.3d 1055, 1065 (9th Cir. 2006). Although it is undisputed that excessive force is unconstitutional, Plaintiff has cited inapposite caselaw in support of her argument that the unlawfulness of Officer Ulitin's conduct in this case was clearly established. For example, in Hansen v. Schubert, 459 F. Supp. 2d 973, 992-95 (E.D. Cal. 2006), the district court denied application of qualified immunity after finding that it was clearly established that an officer engaged in unlawful excessive force when he grabbed a compliant person, ripped her shirt, shoved her against a wall, pointed a gun at her and did not let her cover her exposed breast for several hours. The facts of Hansen are far removed from those in this case, and would not give notice to Officer Ulitin that his conduct in taking the keys from Plaintiff without touching her constituted excessive force.

In Fontana v. Haskin, 262 F.3d 871, 881 (9th Cir. 2001), an officer sexually assaulted an arrestee, leading the court to hold that: "Gratuitous and completely unnecessary acts of violence by the police during a seizure violate the Fourth Amendment." See also Wilks v. Reyes, 5 F.3d 412, 416 (9th Cir. 1993) (stating that nominal damages are available where constitutional rights are violated even if no injury resulted); Tekle v. United States, 457 F.3d 1088, 1095 (9th Cir. 2006) (excessive force can be found even where there is no injury). All these cases involved both a greater degree of force and less justification for using force than here, and would not have put Officer Ulitin on notice that grabbing Plaintiff's keys without touching her to avoid danger to himself or to her would be unlawful conduct. For example, in Tekle, the court determined that the amount of force used against an unarmed eleven-year-old boy who was not the target of the officers' investigation was excessive where officers held a gun to his head, searched him, handcuffed him, pulled him up from behind by the chain of the handcuffs, sat with him on the sidewalk still handcuffed with their guns pointed at him for ten to fifteen minutes. See Tekle, 457 F.3d at 1095. In Wilks, the Ninth

1  Circuit reversed judgment entered in favor of a police officer where the officer made derogatory
2  remarks to the plaintiff, threatened the plaintiff, his family and his friends, and grabbed the
3  plaintiff's shoulder and slammed him against a car, holding him there for approximately one minute.
4  See Wilks, 5 F.3d at 414.  Plaintiff has failed to show that under clearly established law, Officer
5  Ulitin would have known that grabbing the keys from a compliant yet emotional person's hand
6  without any physical contact where the officers and the person could be in danger would be
7  unlawful.

8  Further, Defendant has cited several cases in which conduct more substantial than that in
9  this case did not constitute excessive force.  In Jackson v. City of Bremerton, 268 F.3d 646 (9th Cir.
10 2001), the Ninth Circuit determined that the force used, including pepper spraying and handcuffing,
11 was minimal under the circumstances where the plaintiff interfered with the arrest of another
12 individual, the officers sprayed her hair only with a chemical irritant and she was otherwise
13 uninjured during a normal handcuffing incident.  In Padilla v. City of San Diego, 258 Fed. Appx.
14 964 (9th Cir. 2007), the Ninth Circuit held that there was no excessive force where an officer leaned
15 his body against the plaintiff for less than 15 seconds and yelled in his ear, causing no injury.  Even
16 if Officer Ulitin was speaking strongly to Plaintiff during this incident, the conduct in Jackson and
17 Padilla was more severe than that at issue in this case.  Based on this caselaw, it was not clearly
18 established that grabbing Plaintiff's keys under the circumstances of this case constitutes excessive
19 force.

20 Plaintiff argues that there are disputed facts that preclude summary judgment in favor of
21 Defendant.  However, those facts are not material to the qualified immunity analysis.  First, Plaintiff
22 argues that Officer Ulitin's declaration in support of this motion contradicted his police report,
23 which stated that Plaintiff switched her car's motor on and off several times.  See Defs.' Ex. C at 2-
24 3; Ulitin Decl. ¶ 13.  Defendants point out that for the purpose of this motion, they accept Plaintiff's
25 version of events that the car was off and the keys were in Plaintiff's hands when he grabbed them.
26 Therefore, the Court has examined this case in the light most favorable to Plaintiff in deciding the
27 qualified immunity issue.  Second, Plaintiff states that there is a dispute about whether Plaintiff held
28 onto the keys when Officer Ulitin pulled them away.  Officer Ulitin, however, testified that Plaintiff

7

did not let go of the keys, a fact that Plaintiff did not deny in her deposition.  See Boscovich Decl. Ex. A at 90:11-92:22.

**Conclusion**

Officer Ulitin is entitled to qualified immunity because his conduct did not violate clearly established law with respect to excessive force.  Accordingly, Defendants' Motion for Summary Judgment in favor of Officer Ulitin is granted.

**IT IS SO ORDERED.**

Dated: January 30, 2009

ELIZABETH D. LAPORTE
United States Magistrate Judge

8